1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


United States of America,      )
                Plaintiff,     )
                               )
                               )
vs.                            )      Case No. 12CR40055-1-TSH
                               )
                               )
Anthony Wooldridge,            )
                Defendant.     )


BEFORE:  The Honorable Timothy S. Hillman


                    Sentencing




                         United States District Court
                         Courtroom No. 2
                         595 Main Street
                         Worcester, Massachusetts
                         July 20, 2015








                 Marianne Kusa-Ryll, RDR, CRR
                    Official Court Reporter
                 United States District Court
                  595 Main Street, Room 514A
                   Worcester, MA 01608-2093
                508-929-3399 justicehill@aol.com
              Mechanical Steno - Transcript by Computer

1   APPEARANCES:

2   United States Attorney's Office
    Cory S. Flashner, Assistant United States Attorney
3   Greg Friedholm, Assistant United States Attorney
    Donohue Federal Building & Courthouse
4   595 Main Street, Suite 206
    Worcester, Massachusetts 01608
5   on behalf of the Government

6   Law Office of Raymond A. O'Hara
    Raymond A. O'Hara, Esquire
7   1 Exchange Place
    Worcester Massachusetts 01608
8   on behalf of the Defendant, Anthony Wooldridge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

(The following proceedings were held in open court before the Honorable Timothy S. Hillman, United States District Judge, United States District Court, District of Massachusetts, at the Donohue Federal Building & United States Courthouse, 595 Main Street, Worcester, Massachusetts, on July 20, 2015.)

THE CLERK:  All rise.

Court is now open.  You may be seated.

Case No. 12-40055, United States versus Anthony Wooldridge.

Counsel, please note your appearance for the record.

MR. FLASHNER:  Corey Flashner on behalf of the United States.

MR. FRIEDHOLM:  Good afternoon, your Honor.  Greg Friedholm on behalf of the United States.

THE COURT:  Good afternoon.

MR. O'HARA:  Good afternoon, your Honor.  Raymond A. O'Hara on behalf of Mr. Wooldridge, who is present.

THE COURT:  Good afternoon, Mr. O'Hara; and good afternoon, Mr. Wooldridge.

THE DEFENDANT:  Good afternoon.

THE COURT:  Just give me one second, please.

(Probation conferred with counsel.)

THE COURT:  Okay.  Just to set the record, we are here for Mr. Wooldridge's sentencing; and in preparation for that, I

1   have read and reviewed Ms. Roberts', as always, excellent

2   presentence report, which was prepared on May 6th; although

3   there was a pre-plea report prepared on April 7th, and then the

4   report was revised on July 1st.

03:05:01PM 5        In addition, I have received and read Mr. O'Hara's

6   sentencing memorandum that was dated on July 16th, and attached

7   to it were a number of very helpful communications from family

8   and friends of the defendant.  There was some medical

9   information attached to it as well.  I'm unaware of any other

03:05:37PM 10  materials.

11        Is the government aware of anything that I missed?

12        MR. FLASHNER:  I'm not, your Honor.

13        THE COURT:  Mr. O'Hara?

14        MR. O'HARA:  No, I assume that you're acknowledging

03:05:47PM 15  the receipt of Dr. Mendoza's report?

16        THE COURT:  That's correct.

17        MR. O'HARA:  Okay.  All right.  And then -- because

18  what I did is I filed a redacted copy on line, and I just did

19  that on my own.  It wasn't that much that had to be redacted.

03:06:03PM 20  There were just a few paragraphs so rather than --

21        THE COURT:  I did get the --

22        MR. O'HARA:  Rather than having the entire thing filed

23  under seal -- I think I learned that with Judge Saylor -- I

24  redacted what I felt were the sensitive portions and filed

03:06:16PM 25  everything else directly with you in the unredacted form.

1            THE COURT:  Thank you.

2            Mr. O'Hara, while you were -- while you were up, have

3    you had a chance to not only review the presentence report but

4    to go over it with Mr. Wooldridge?

03:06:32PM 5            MR. O'HARA:  Yes.

6            THE COURT:  And, Mr. Wooldridge, do you feel that you

7    have had enough time to go through the presentence report, and

8    are you prepared to move forward today?

9            THE DEFENDANT:  Yes.

03:06:40PM 10            THE COURT:  All right.  All right.  So I'm going to

11   start by just going through the offense-level calculations

12   because I know, Mr. O'Hara, you wanted to take issue with some

13   of that, and then I will go to the criminal history

14   calculations and then the sentencing options.

03:07:04PM 15            So the offense-level computation is as follows:  The

16   defendant presents with a base offense level of 32, and to that

17   there were no adjustments for role, victim related, or

18   obstruction of justice; and from that there was a two-level

19   deduction for acceptance of responsibility.

03:07:37PM 20            And is the government prepared to make a motion on a

21   third-level reduction?

22            MR. FLASHNER:  Your Honor, the government would so

23   move.

24            THE COURT:  All right.  Now, because of the

03:07:51PM 25   defendant's career offender status, that makes the career

1    offender offense level at 37 from which again there is a

2    three-level deduction for a total career offender level --

3    offense level of 34.

4         Mr. O'Hara, you wanted to be heard on the attributable

03:08:18PM 5    weight?

6         MR. O'HARA:  Yes, your Honor.  Based upon -- the Court

7    was not required to make specific findings as to why it held

8    that Mr. Wooldridge was responsible for more than the

9    280 grams, which triggers the 120-month mandatory sentence, and

03:08:38PM 10   when I reviewed the -- my notes of what happened during the

11   seven-day trial in February, it wasn't clear to me how the

12   Court had arrived at that -- at that number.

13        There were conversations that were recorded indicating

14   that Mr. Wooldridge delivered 200 of something.  Back, I

03:09:01PM 15   believe, on June 25th or June 27th of 2012, after that

16   conversation and after Mr. Wooldridge was observed by law

17   enforcement interacting with Mr. Hernandez, there were

18   conversations between Mr. Hernandez and Mr. Dunston regarding

19   the cooking process.

03:09:21PM 20        Subsequent to those conversations, Mr. Wooldridge then

21   appeared on the -- significantly during the wiretap interacting

22   with Mr. Hernandez towards the end of July, and there was an

23   indication that Mr. Hernandez had received 300 grams of powder

24   cocaine from one of his sources, and that 300 grams was cooked

03:09:44PM 25   up by Mr. Hernandez and Mr. Dunston and then divided between

1    Mr. Hernandez, Dunston, and Mr. Wooldridge, who each got

2    approximately 100 grams.

3          Mr. Wooldridge was subsequently arrested shortly after

4    those conversations were recorded, and he was in possession of

03:10:02PM 5    93 grams of crack cocaine.

6          After that, Mr. Wooldridge kind of disappears from the

7    telephone calls.  And by the middle of August, his

8    conversations with Mr. Hernandez are extremely limited and

9    rare, and it's during that time period between the middle of

03:10:21PM 10   August and the end of August that Mr. Hernandez is heard making

11   arrangements with Mr. Cruz, Compi, for the delivery of the

12   500 grams that are later intercepted through the Postal

13   Service.  He's also involved with protracted negotiations

14   through a female friend of his to have the stuff delivered to

03:10:43PM 15   her surreptitiously saying he was receiving some kind of gift

16   from his girlfriend.  And there are limited conversations

17   between Mr. Hernandez and Mr. Dunston about that arrangement.

18   There are no conversations between Mr. Wooldridge and

19   Mr. Hernandez about what Mr. Hernandez's plans are with Compi.

03:11:02PM 20         So there are a variety of ways that the Court could

21   have arrived at 200 grams of cocaine.  It would require that

22   the 200 of whatever Mr. Wooldridge delivered to Dunston and

23   Hernandez back in June was converted to crack and that he

24   reasonably should have foreseen that.  Obviously, the 93 grams

03:11:21PM 25   that are found on his person, he's responsible for.  We've

1   never contested that, nor have we ever contested his part in

2   the conspiracy.

3          So my argument is that he shouldn't be held

4   accountable for 500 grams that Mr. Cruz, Compi, was sending up

03:11:35PM 5   to Hernandez the end of August, and that in a worst-case

6   scenario he shouldn't be held accountable for more than

7   the -- I believe it's 800 grams, which triggers a level 34.

8          All of what I'm saying, of course, is trumped by the

9   fact that based upon his criminal record, he does classify and

03:11:57PM 10   qualify for career offender status.  And I'll address that in a

11   moment.

12          THE COURT:  Thank you.

13          Do you want to be heard on that, Mr. Flashner?  Are

14   you pulling the oar on this?

03:12:10PM 15          MR. FLASHNER:  I am.  Briefly, your Honor.  I think

16   Probation -- in short, I think Probation got it right.  They

17   held him accountable for the other 497 grams of powder that was

18   sent up by Richard Cruz, or Compi, to Mr. Hernandez.  There is

19   repeated phone calls during the course of the conspiracy

03:12:31PM 20   between this defendant and Sergio Hernandez asking about

21   sources of cocaine, and more specifically asking about Compi.

22          I think based upon that there's an agreement that they

23   are going to find another source, whether it be Compi or

24   someone else, and that there's enough to hold him accountable,

03:12:48PM 25   and that it was reasonably foreseeable to him -- attributable

1    to him.

2         Thank you.

3         MR. O'HARA:  If I could just say one other thing.

4         THE COURT:  Sure.

03:12:54PM 5    MR. O'HARA:  At the close of the case, the government

6    submitted a memorandum in binder form where they indicated, as

7    I attached to my sentencing memorandum, that Mr. Wooldridge was

8    not responsible for that amount that was delivered by

9    Cruz/Compi; that he was only responsible for 778 grams.  So I

03:13:11PM 10   would ask that they be held to what they said at the close of

11   the case.  They were present and they prosecuted it.

12        THE COURT:  All right.  I do find that there was at

13   least 497 grams attributable -- I mean that there's -- that the

14   offense involves at least 840, but less than 2.8.

03:13:38PM 15        Now, tell -- talk to me about the career offender.

16        MR. O'HARA:  Well, as I said in my memoranda, the

17   career offender guideline, when the guidelines were more or

18   less mandatory, was the most utilized grounds for departure by

19   judges nationwide, and the reason that it was frequently

03:13:56PM 20   departed from was because the criminal history status that was

21   stated in the career offender guideline overstated a person's

22   propensity and the seriousness of their criminal record.  And

23   Mr. Wooldridge falls right into that category.

24        He has two offenses on his record which trigger career

03:14:16PM 25   offender status.  They only need two, and both of them were for

1    relatively minor street-level cases involving drugs where he

2    had private attorneys or court-appointed attorneys, pleaded

3    guilty.  In one case it was a continuance without a finding;

4    and the second case, which happened about a year later, he was

03:14:33PM  5    given 90 days in the house of correction.

6         Based upon that 90-day sentence, the continuance

7    without a finding was revoked, and he was given 90 days

8    concurrent on that case also.  So he had 90 days in the house

9    of correction about six or seven years before he's involved in

03:14:51PM 10    this conduct here.

11         There are other cases on his record, which are minor,

12    including a mutual assault and battery with his siblings, which

13    was disposed of with a mutual guilty filed.  His record simply

14    is not as significant as that of somebody who would be

03:15:07PM 15    classified as a career offender.

16         The Court also has information about Mr. Wooldridge

17    regarding his problems.  He is a street-level seller of -- of

18    drugs, of cocaine and marijuana, and he was selling those

19    quantities basically to maintain his own habit, which got worse

03:15:24PM 20    and worse as he became more heavily addicted to opioids.  So I

21    would suggest to the Court that he is not the person that the

22    Commission more or less pigeonholed for the career offender

23    status.  He's not a major drug dealer.  He was a minor drug

24    dealer with a heavy habit, who was involved in street sales of

03:15:46PM 25    drugs.  And as I said, his prior interactions with courts were

1    relatively minor, especially when you compare his record to

2    that of Mr. Dunston.

3            So I would suggest to the Court that the sentence

4    that's suggested by the career offender guideline in his case

03:16:04PM  5    grossly overstates the seriousness of his past conduct and is

6    grossly disproportionate with his offense conduct in this case

7    and what kind of a sentence he should be, you know, imposed by

8    the Court.

9            THE COURT:  Do you want to weigh in on the ...

03:16:16PM 10    MR. FLASHNER:  Your Honor, just -- just two points

11    that I would want to make.  Just so the record is clear, the

12    government did use a chalk during its closing argument in which

13    it submitted that Mr. Wooldridge was responsible for the

14    498 grams that was sent up by -- by Mr. Cruz.

03:16:30PM 15            The government in its argument -- I believe the

16    argument was even if you said they only got .6, even if the

17    conversion rate for this was only .6, it would still be

18    299 just as a way to give the defendant the benefit of the

19    doubt -- benefit of the doubt.  The government has never

03:16:47PM 20    strayed from its belief, however, that it did prove a

21    one-to-one ratio.

22            Setting that aside now that I think the record's

23    accurate.  With regard to the career offender, he has two prior

24    convictions.  This Court has seen career offenders with more

03:17:03PM 25    serious offenses and career offenders that have served more

1    jail time for their prior offenses.  That said, as the statute

2    is written, I believe he does qualify.

3              THE COURT:  Thank you.  I -- I agree that he does

4    qualify.

03:17:18PM 5              All right.  So that makes the guideline provisions

6    262 to 327 months, a five year supervised release guideline,

7    probation not authorized, and a fine of 17,500 to $11 million.

8    Restitution is not applicable, and there's a special assessment

9    of $200.

03:17:53PM 10             All right.  Let me hear you -- from the United States

11   first, please.

12             MR. FLASHNER:  Thank you, your Honor.

13             The defendant faces actually two sets of charges.

14   There's the overarching conspiracy for which he's responsible

03:18:06PM 15  for over 280 grams, and then there's Count Two of the

16   superseding information for which he faces a five-year

17   mandatory minimum for the over 28 grams when he's arrested with

18   just under a hundred grams of crack cocaine back on July 31.

19             In looking at Mr. Wooldridge, there are really three

03:18:29PM 20  principal transactions that he is involved in.  He figures in

21   as a supplier to Mr. Hernandez on June twenty -- and

22   Mr. Dunston on June 25th and June 26th when he supplies them

23   with 200 grams of powder cocaine that they then cook into crack

24   cocaine for $8,200.

03:18:48PM 25             With respect to him being a street-level user, who's

1    simply satisfying his own drug habit, these are not

2    transactions that a street-level user would be involved in.

3    We're talking about $8,200 in cash for 200 grams.  It's not a

4    street-level transaction of someone who's a drug-addicted

03:19:14PM 5    person selling 8 or 10 gems, or rocks, of crack cocaine in

6    order to steal or have one in order to support their own habit.

7    I think that to consider Mr. Wooldridge a street-level user of

8    drugs is -- is -- is not what the evidence showed at trial.

9         Looking at -- the second incident is on July 31.

03:19:33PM 10   Mr. -- Mr. Hernandez and Mr. Dunston purchased approximately

11   300 grams of crack cocaine.  Mr. Wooldridge is in contact with

12   them.  He ultimately gets his third of that, and he's

13   ultimately arrested later on that evening by the Worcester

14   Police Department and subsequently charged in state court after

03:19:53PM 15   his arrest.  He had approximately 98 grams on that particular

16   day.  And then there's the 500 grams that are sent up from

17   Mr. Cruz that he's also attributable to.

18        The Court had seven days of testimony on that.  The

19   Court has sat through a lot of hearings in which it has heard

03:20:10PM 20   evidence on all these.  I just wanted to make the record fairly

21   clear.

22        What concerns the government and what I want to

23   highlight for the Court today is Mr. Wooldridge's conduct after

24   his arrest on July 31, 2012.  It's what he does and what he

03:20:25PM 25   doesn't do.

1    He doesn't think: I got in trouble.  I'm going to

2  stop.  Rather, his -- his -- his actions, and we know his words

3  because it was a Title III intercept, are the exact opposite of

4  that.  This isn't someone who says, I'm in trouble.  I'm going

03:20:43PM 5  to stop.  I have a drug habit.  I'm going to stop.  There's

6  nothing like that.  Rather, and I'm just going to read a couple

7  of quotes from Mr. -- Mr. Wooldridge.

8    On August 2nd, just two days after he's arrested,

9  Mr. Hernandez received a call from Mr. Wooldridge, and

03:20:59PM 10  they -- they begin to discuss -- discuss Mr. Wooldridge's

11  situation, and Mr. Wooldridge responds that he's going to cut

12  everyone off and, quote, "only keep about seven or eight

13  people, and all the new ones can't be trusted," end quote.  So

14  here he is two days after being arrested in state court.  He

03:21:18PM 15  was charged with the mandatory minimum, facing serious drug

16  charges.  He's released.  And his thought is, how can I keep my

17  business going and not get rearrested, not get in trouble with

18  law enforcement again.

19    He's basically just deciding that he's going to

03:21:35PM 20  continue to work as a crack cocaine dealer, and he even tells

21  the police that day that he feels like the case against him is,

22  quote, "was not beatable," end quote.

23    And then you look -- and this is perhaps the most

24  troubling is the next day, August 3rd, 2012, just after

03:21:54PM 25  11:18 p.m. that day.  Mr. Wooldridge and Mr. Hernandez have a

phone conversation, and Wooldridge goes on and describes how

he's going to limit his potential exposure to law enforcement

since his arrest.  And he states, quote, I got like five people

that want like 100 pieces, and then I need to like get a seven,

nigga.  I'm only fuckin' -- I know there's a lot of family, and

there are some young children in here.  If they want to take

them out, I suggest they do it now.  The language is not

something they may want to not choose to have their children

hear.

And then I need to get a seven, nigga.  I'm only

fuckin' with like seven people, nigga.  People that never leave

their crib.  People that I've dealt with since I was a kid.

People that I just go to their crib.  So even if I only have

eight or nine people right now, I'm cutting off like 50 people.

I don't even give a fuck.  I just want to make a few dollars,

like, you can't get me a seven right now.

And what Mr. Wooldridge is saying there is he's asking

Mr. Hernandez to get him a seven, to get him some -- a quantity

of crack cocaine, and he's indicating that he's going to deal

to people that he can trust and people that he doesn't think

that will get in trouble with because he goes to their house or

their crib and sell to it.  But he also says that he's cutting

off, like, 50 people.  Cutting off 50 people.  Those are 50

people who -- who like Mr. Wooldridge -- who are like Mr.

Wooldridge in some sense because they're sons and daughters and

1   fathers and mothers and nephews and nieces to someone.  But

2   those people are the people who he, instead of going to work

3   every day, getting up at 9:00 a.m., these are the people who

4   he's serving.  He's serving them with drugs, and he's pumping

03:23:47PM 5   those drugs right back into the community.  Fifty people by his

6   own words.

7        To consider him a street-level dealer, your Honor, he

8   is just not.  He's engaging in at least 200-gram transactions

9   that we know -- 200 grams in a single transaction for over

03:24:05PM 10  $8,000.  He's servicing, by his own words, at least 50

11  different clients at least at one point.  At least at this

12  point.  He is out there, and he is selling drugs to people in

13  this community, and that's what he's doing.

14       If you look at his prior history, and I'm not -- I'm

03:24:23PM 15  not going to sit here and pound the table and suggest that this

16  Court hasn't seen career offenders with worse histories.  Of

17  course it has.  Has Mr. Wooldridge ever been indicted?  No, he

18  hasn't.  Has he ever served jail time?  Yes, he has.  Has he

19  ever served state prison time?  No, he hasn't.  I mean, he

03:24:42PM 20  received a -- in 2005, distribution of Class B and Class D.  He

21  received a -- I want to make sure it is Class B, your Honor.

22       Class -- Class B and Class D, he received a

23  continuation without a finding, and then he ends up with six

24  months committed.  But that was back in '05.  This case

03:25:05PM 25  happened in '12.  That's seven years earlier.  So he has been

1    dealing drugs for seven years.  He got arrested then.  He

2    received a break.  The state court gave him a continuation

3    without a finding, which if he had just stayed out of trouble,

4    this Court well knows, it ultimately would have read on his

03:25:25PM  5    criminal history as a dismissal.  He is unable to do that.

6           And then in 2006 he's arrested again for possession of

7    D with the intent to distribute.  And he's arrested again.

8    It's not an incredibly large quantity of crack cocaine, but

9    he's arrested with crack cocaine, and he receives a 90-day

03:25:43PM 10    committed sentence at that time.  Two prior drug distributions

11    in his history.

12           Are they the most serious career offender predicates

13    this Court has ever seen?  No, but are they illustrative of

14    Mr. Wooldridge and the fact that he's dealing drugs.  He has

03:25:59PM 15    been dealing drugs for the past seven years.

16           His criminal history, as it's relayed in the PSR, also

17    does contain some history of violence.  There's no shootings.

18    There's no stabbings, but there is some history of violence.

19    It's violence within -- most of it, the convictions at least,

03:26:14PM 20    are continuations without a finding are for violence that

21    happened within his family.  These dating back from '06 and '05

22    as well.  There are some other assault and battery arrests, but

23    those are not convictions.

24           In terms of an appropriate sentence, your Honor, there

03:26:30PM 25    is a mandatory minimum sentence on Count One of ten years, and

1    there's a mandatory minimum sentence of five years on

2    Count Two.

3            The Court has within its discretion to run those

4    consecutive or concurrent, and the defendant's guideline

03:26:44PM 5    sentencing ranges is well above that.  It's -- it's -- the low

6    end of that is over 20 -- approximately 22 years.  262 months.

7    That is a very long sentence, and the government is not going

8    to stand here and ask you to impose the minimum career offender

9    sentence.

03:27:04PM 10            The government is also cognizant of the previous

11    sentence -- sentences that defendants have received in this

12    case; and in fairness, the government has stated almost since

13    the time of the initial appearance in this case that

14    Mr. Hernandez was at the top of this; Mr. Dunston was a very

03:27:21PM 15    close second; and Mr. Wooldridge was a fairly distant third.

16    And the government is -- I would be remiss if I didn't state

17    that again.  The government has requested sentences of, I

18    believe, 20 years for Mr. Hernandez.  I believe it was 19 years

19    for Mr. Dunston.  Mr. Hernandez hasn't been sentenced.

03:27:42PM 20    Mr. Dunston received a 12-year sentence.  The government took

21    that into consideration, but the government is aware of the

22    guidelines and is aware of the purpose of the guidelines as

23    well as the 3553(a) factors.

24            Looking at all those factors and looking at this

03:28:00PM 25    defendant's history of drug dealing, the government feels that

1     a significant sentence is warranted, and the government would

2     recommend the following:  We would recommend a 15-year sentence

3     on Count One, the conspiracy count; a five year committed

4     sentence to run concurrent on Count Two; a five-year period of

03:28:17PM 5     supervised release, which is the minute -- the minimum period

6     of supervised release required by statute on both counts to run

7     concurrent; a $100 special assessment on both counts -- on each

8     count, rather; and a forfeiture as alleged in the indictment.

9     That would be the government's recommendation given this

03:28:34PM 10    defendant, given his prior history, and given some of the other

11    factors that I'm sure Mr. O'Hara will get into during the

12    course of his discussion with the Court and his argument to the

13    Court concerning Mr. Wooldridge's upbringing and some of the

14    hurdles and obstacles that he had to overcome during that time

03:28:51PM 15    period.

16         Thank you.

17         MR. O'HARA:  If I could just say one thing.  I have to

18    step back, but I want to make sure I'm not messing up more than

19    I already have.  We're not conceding, and I don't believe there

03:29:03PM 20    was any evidence produced at trial indicating that there's a

21    one-on-one conversion rate between powder cocaine and crack

22    cocaine.  And in my sentencing memorandum I included a

23    conclusion that was made in a case a couple of months ago with

24    Judge Zobel where she made the same statement.  The government

03:29:22PM 25    at the close of the case in its chalk indicated that it also

tended to agree with the testimony of the expert, who testified

basically without objection, that the 492 or '95.2 grams of

crack cocaine that had been delivered by Mr. Cruz to

Mr. Hernandez could not have been converted into a similar

amount of cocaine powder.  So I just want the record to reflect

that we're not acquiescing in the argument that the 500 grams

that were delivered by Mr. Cruz to Mr. Hernandez would have

converted into 500 grams of cocaine base.  And that is like on

the tail end of my argument that he shouldn't have been

accountable for any of that.

We also wanted the Court to know, and I want to bring

this up again, just for the sake of protecting the record, that

there were conversations at the end of June when he delivered

200 of whatever he delivered to Mr. Hernandez, indicating that

Mr. Hernandez and Mr. Dunston at that time were selling powder

cocaine, and it wasn't clear whether the entire 200 grams were

converted to crack where the sum was powder.  To me it wasn't

clear if the Court made its ruling.  I just want my objection

to be reflected in the record.

THE COURT:  Thank you.

MR. O'HARA:  I also would like to thank the Court for

putting up with me and my co-counsel for two weeks in February.

This is new ground for me.  I have never been in a situation

where I had a jury-waived trial, I think ever, no less on an

issue regarding weight that would affect sentencing.  All my

1    previous experience with these cases were basically arguments

2    that were conducted at sentencing or at hearings at sentencing

3    under a preponderance standard.

4         Mr. Wooldridge, your Honor, I probably have said this

03:31:20PM 5    before, and you've heard this from other counsel.  He's not the

6    person I met when I first was appointed to represent him.

7    Actually, I was retained.  Physically, he's about less than

8    two-thirds of what he was when I first was encountering him.

9    He's also not ill.  When I first met with him he was going

03:31:39PM 10    through withdrawal.  He has lost over a hundred pounds, and I

11    recognize him because I've seen him so often during the past

12    two and a half, almost three years, but physically he's a

13    different person.  Mentally, he's a different person.  And

14    since my representation of him has begun, he has undergone a

03:32:02PM 15    180-degree change in attitude.

16         The reports that you have from various sources,

17    especially from Dr. Mendoza, indicate that he seems to have a

18    predisposition towards an anxiety issue and depression, and I

19    can attest personally from having met with him the first year

03:32:21PM 20    of my representation that it was extremely difficult.  I am not

21    a mental health specialist, but the amount of panic and

22    preoccupation he displayed to me was very difficult at times.

23    And as he went through -- actually, when he was placed in

24    Wyatt, and out of Walpole -- I don't know -- I have no idea

03:32:44PM 25    while -- why he was placed in Walpole.  It was something the

1     marshals had worked out because of overcrowding.  As soon as he

2     was removed from Walpole and placed in Wyatt, he began meeting

3     twice a month with mental health counsellors there.  They

4     monitored his medication.  They provided him with medication.

03:33:01PM 5   They changed the medication, and his attitude has changed, and

6     he has been given positions of significant trust within the

7     institution as he has progressed through the treatment.

8          He is now given -- pretty much he's on an open

9     schedule with the health services, and whenever they have

03:33:18PM 10  massive arrests like happened a couple of weeks ago in Boston

11    with the 45 people who were picked up in Boston, a lot of those

12    people were sent to Wyatt.  He has to prepare the medical

13    review packets before they arrive.  So it's not a steady job.

14    It's just something that he finds out about, they tell him to

03:33:35PM 15  do it.  And from what I understand, he's very good at doing it.

16    He has got a good brain.  He has a lot of potential, and

17    unfortunately, he has --

18         THE COURT:  There was a nice letter from Wyatt

19    about --

03:33:45PM 20       MR. O'HARA:  Ms. Singleton, yeah.  And also, I

21    included every letter that I got in support.  Sometimes I edit

22    them, or I think you have too much on your plate, but the

23    members of his family and friends went out of their way to

24    write letters on his behalf, and I didn't think I had the right

03:34:03PM 25  to withhold any from your own view.  And if there was a common

thread in those letters it was that he has a heart of gold;

he's very generous; he tries to take care of people.  And most

of the people in his family had no idea how deeply he was

addicted to opioids since his late teens.  And when I first met

03:34:24PM with him more than two years ago, he was going through

withdrawal symptoms.  He was physically ill.  He was on

opioids.

Cocaine, as bad as it is, is not physically addictive.

It is psychologically addictive.  Heroin and opioids will kill

03:34:41PM you.  They can kill you during your withdrawal.  They can kill

you if you keep taking them.  And I don't need to bring to the

Court's attention the number of people recently who have died

from using heroin, which is where he was headed, if he hadn't

been arrested, because what happens frequently is that people

03:34:57PM become addicted to prescription painkillers; and then when they

can't get the prescriptions, they buy heroin on the street, and

the potency of the heroin fluctuates to the extent that people

can die.  So being arrested is probably something which may

have saved his life, and I think he has grown to an

03:35:14PM understanding of that.

His role in this offense, as Mr. Flashner said, is

much different than that of Mr. Dunston and Mr. Hernandez.  By

my informal count, 85 percent of the recorded telephone calls

on Mr. Hernandez's phone were between Hernandez and Dunston.

03:35:32PM There were phone calls between Hernandez and others and Dunston

1    where they're talking about firearms.  He was not involved,

2    Mr. Wooldridge, with any of that.

3            When Mr. Dunston -- excuse me -- when Mr. Hernandez

4    was arrested, a loaded firearm was found in the -- in the place

03:35:45PM  5    where he was staying.

6            When Mr. Wooldridge was arrested, there were no

7    firearms found.  There's no violence involved in anything that

8    he was involved in in this particular case.  And I have to say

9    that the fact that he supplied 200 grams of powder cocaine to

03:36:01PM 10    Mr. Hernandez back in June was the only time, at least

11    according to the wiretaps, that he did that, and we don't know

12    where that 200 grams came from.  He certainly didn't profit by

13    $8,200 himself for his own personal use on that.

14            What he was doing was he was selling small quantities

03:36:20PM 15    of crack cocaine, $20 and $40 portions to street addicts in

16    order to get enough money to support his own habit.  And by

17    being arrested in this case, we have enabled him to arrest his

18    habit.  He has done everything he could, not so much because

19    he's looking for a shorter sentence, but because he needs help.

03:36:40PM 20    Any program that was made available to him, and there's not a

21    whole lot available at Wyatt, he has done, he has completed,

22    and he has come through it in flying colors.  He has also

23    extended himself without my knowledge to other clients of mine

24    who were incarcerated, and I found out after the fact that he

03:36:58PM 25    had done that.  He has rediscovered his religion, which he had

1    neglected and lapsed while he was using drugs, and he's

2    involved not only in bible study, he's also conducting bible

3    study.

4         The Court should be concerned based upon the number of

03:37:14PM 5    arrests on his record.  How is he going to stay out of trouble

6    when his sentence is over?  And all I can tell you is that if

7    he's not using drugs, he will be law abiding.  That's what he

8    wants to do.  And right now for the past two-plus years, he has

9    been clean, he likes being clean, he doesn't want to fall back

03:37:32PM 10    into that again.

11         As I stated in my memorandum, I specifically remember

12    meeting with Mr. Cantino, who at the time had taken over for

13    Ms. Cuascut as the pretrial services officer in this court, and

14    we were working out details to have him released when he said,

03:37:49PM 15    "No, I don't want to be released.  I'm going to go back to

16    using drugs.  I can't control it.  I don't want to be released.

17    I don't want my mother putting up the house to get me out of

18    here because I'm going to screw up.  This is where I need to be

19    until I'm clean and sober."  And he's not happy being

03:38:07PM 20    incarcerated.  I don't want to state that he's not happy at

21    all, but he has done what he could to show the Court that he's

22    a suitable candidate for release.  He looks forward to getting

23    the 500 hour RDAP Program within the Federal Bureau of Prisons,

24    and he welcomes the fact that when he is released he will be on

03:38:26PM 25    conditions of release that will include mental health

1       counseling and also include narcotics counseling.  And I think

2       with those two components of his supervised release, I'm

3       confident, and I very rarely am, that he can actually do it, he

4       can actually turn his life around.

03:38:42PM 5           Ten years is what I'm asking for.  Ten years is the

6       least you can give him.  I look at ten years, your Honor, my --

7       my twins are entering their sophomore year in college.  I just

8       got the bill, and I'm like, I've got to do this for another

9       three years.  It seems like forever.  He's looking at ten

03:39:01PM 10    years, another five or six years on top of what he has already

11      served.  It takes ten years of studying to become a doctor.  It

12      takes eight to ten years to become a priest.  He's at the

13      bottom of the hill looking up, and I suggest to the Court that

14      given the problems he has had, which are the root of his

03:39:19PM 15    difficulties in terms of substance abuse, in terms of what he

16      suffered as a child, in terms of his panic disorders and

17      history of depression that you have a blueprint for success for

18      him provided he gets alcohol and drug treatment and provided he

19      gets psychological counseling.

03:39:38PM 20          In fashioning a sentence which is not longer than

21      necessary to comport with the requirements of 18 U.S.C.,

22      3553(a), I would suggest that 120 months is a long period of

23      time for this man.  It keeps him away from his family for at

24      least another four or five years.  He lives every day with the

03:39:58PM 25    knowledge of what he did wrong, and I would be very, very

1    surprised and disappointed no matter what sentence he gets if

2    he were to re-offend in the future.  I think he understands

3    what his problem is and how to deal with the problem, and that

4    there's no easy solution, but he's willing to do whatever he

03:40:16PM 5    can, including going into a care program or any kind of program

6    that has heightened supervision afterwards, because he

7    desperately does not want to be in this situation again.

8            Thank you.

9            THE COURT:  Mr. Wooldridge, do you wish to address me

03:40:32PM 10   before I impose sentence?

11           THE DEFENDANT:  Yes.

12           THE COURT:  Please do.

13           THE DEFENDANT:  Thanks for allowing me to speak this

14   afternoon.

03:40:40PM 15           MR. O'HARA:  Speak louder into this microphone.

16           THE DEFENDANT:  I'm a little nervous, so I'm going to

17   read off the --

18           THE COURT:  It's okay.  Anyway you want.

19           THE DEFENDANT:  All right.  To start, first and

03:40:53PM 20   foremost, I would like to apologize to all the victims whose

21   lives I've damaged.  I'm truly sorry and extremely heartbroken

22   to have done such.

23           There isn't a day that goes by that I don't think

24   about what I've done.  I'm so deep into my own problems and

03:41:05PM 25   addiction that I did not realize the harm I was causing, which

1    is no excuse for what I did.

2            In the past year, I have met numerous inmates whose

3    lives have been ruined by drug addiction, which I now know is

4    as serious a problem as my own.

03:41:17PM  5    Next, I would like to thank my entire family for

6    endless love and support.  I finally realized how lucky and

7    blessed I truly am.  Not only have you all been supportive of

8    me, but you have all filled the voids in my children's lives

9    due to my absence.

03:41:32PM 10    I cannot express in words how thankful I am.  To my

11    mother and my three beautiful children, my love for you is

12    endless.  I'm embarrassed as your son, and I'm embarrassed as

13    their father.

14            Mom, I know you didn't raise me to do harm.  In fact,

03:41:47PM 15    it was the opposite.  You raised me to love, work hard, and

16    always lead by an example.  Despite this mess I got myself

17    into, I know you still love me, and I want to thank you for

18    doing so unconditionally.  I hope to be home soon, and always

19    remember that I love you dearly.  I know there is more for me

03:42:04PM 20    to accomplish in my rehabilitation, but I'm on the right track.

21    I believe having structured my life will be the key for my

22    success.  I know I can be a positive example in my home and in

23    my community.

24            So today, your Honor, I'm asking you to consider

03:42:17PM 25    giving me the least amount of time possible so I can get home

1    to my children and family so that I can be the father and the

2    man I want to be.

3           Lastly, I want to thank my attorney Ray O'Hara for all

4    the time he put into my case and for all of his efforts.

03:42:30PM 5           THE COURT:  Thank you.  Nice job.

6           THE DEFENDANT:  Thank you.

7           THE COURT:  Michelle.

8           (The Court conferred with Probation.)

9           MR. FLASHNER:  Your Honor, just before you pronounce

03:43:08PM 10   sentence, I just want to restate the government's position in

11   case there is an appeal from whatever sentence the Court may

12   impose.  The government's position has consistently been that a

13   one-to-one crack -- powder cocaine to crack cocaine ratio is

14   appropriate in this case based upon the statements of the

03:43:24PM 15   defendants during the case.

16          The chart the government used in its summation was

17   merely meant to establish how strong the evidence was and that

18   even giving every benefit of the doubt to the defendant, even

19   beyond that required, or even suggested by the evidence, they

03:43:40PM 20   would have met the standard at trial.

21          THE COURT:  All right.  Mr. Wooldridge, if you would

22   stand up, please.

23          So pursuant to the Sentencing Reform Act of 1984, and

24   having considered the sentencing factors enumerated at

03:44:08PM 25   18 United States Code, Section 3553(a), it is the judgment of

1    this Court that you should be committed to the custody of the

2    Bureau of Prisons to be imprisoned for a term of 132 months.

3    This term consists of 132 months on Count One and a term of

4    60 mounts on -- months on Count Two to be served concurrently.

03:44:31PM 5        I am going to recommend participation in the Bureau of

6    Prison's Residential Drug Abuse Program; and upon release from

7    imprisonment, you shall be placed on supervised release for a

8    term of five years.  That will consist of terms of five years

9    on Count One and five years on Count Two to be run -- run

03:44:55PM 10   concurrently.

11        I impose no fine, as I find you have no financial

12   ability to pay such.

13        I am imposing the mandatory and special conditions of

14   probation that Ms. Roberts has recommended in her presentence

03:45:10PM 15   report, and I am adding a third special condition that you

16   should engage -- be evaluated for, engage in, and successfully

17   complete mental health counseling.

18        I'm ordering that you should pay to the United States

19   a special assessment of $200, which shall be due and payable

03:45:31PM 20   immediately.

21        You can be seated.

22        You can appeal your convictions if you believe that

23   your guilty plea was unlawful or involuntary, or if there was

24   some other fundamental defect in the proceeding that was not

03:45:44PM 25   waived by your guilty plea.

1          You must file your notice of appeal within 14 days

2     after the entry of judgment; and if you request, the clerk will

3     immediately prepare and file a notice of appeal on your behalf.

4          So, look, there's no good news here, and I take no

03:46:06PM 5     pleasure in this.  This is just not the way you want to do

6     things.  It's not the way I want to do things.  I am -- I do

7     want to say this.  I'm gratified by the fact that even while

8     you are incarcerated, you are taking the steps to turn this

9     thing around and get a handle on your addiction and getting

03:46:28PM 10    engaged in the program.  So that's a good thing.  So, you know

11    what, I usually tell people to make this the beginning and not

12    the ending, and I can tell you've already done that.  So that's

13    a good thing.

14         The other thing is this: I can't tell you how lucky

03:46:44PM 15    you are to have these wonderful people back here supporting

16    you.

17              THE DEFENDANT:  Yes.

18              THE COURT:  It's not every day -- I mean it breaks my

19    heart when people have got nobody back there and you know

03:46:52PM 20    damn well that when they get out it's going to be the same old,

21    same old.  Okay.  These people are here to help you, and

22    they're here to keep you in the discipline and the things you

23    need.  And I know you're disappointed in yourself and -- and,

24    you know, you feel you've disappointed them, but guess what,

03:47:10PM 25    they're here because they want you to succeed, and they love

1    you.  And guess what, it doesn't happen like that a lot.  So

2    take advantage of this.  Make this a beginning, okay, not an

3    ending.

4            THE DEFENDANT:  Yes.

03:47:21PM 5            THE COURT:  All right.  Anything further from the

6    government?

7            MR. FLASHNER:  Nothing further from the government,

8    your Honor.

9            THE COURT:  The defendant?

03:47:26PM 10           MR. O'HARA:  No, your Honor.

11           THE COURT:  All right.  Good luck.

12           THE DEFENDANT:  Thank you.

13           THE COURT:  We're in recess.

14           (At 3:47 p.m., Court was adjourned.)

15

16

17

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T E

2

3          I, Marianne Kusa-Ryll, RDR, CRR, do hereby

4    certify that the foregoing transcript is a true and accurate

5    transcription of my stenographic notes before the Honorable

6    Timothy S. Hillman, to the best of my skill, knowledge, and

7    ability.

8

9

10       /s/ Marianne Kusa-Ryll                          11/15/15

11       Marianne Kusa-Ryll, RDR, CRR                    Date

12       Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25